UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:16-cv-98

| | |
|---|---|
| BAKARI RAWLINSON, | ) |
| Plaintiff, | ) |
| v. | ) **COMPLAINT** |
| PARKER HANNIFIN CORPORATION, | ) |
| Defendant. | ) |

Now comes Plaintiff, requesting a jury trial, and alleges the following against Defendant:

**PARTIES**

1. Plaintiff is a citizen and resident of North Carolina and is African-American. Plaintiff worked for Defendant in Mecklenburg County for over 13 years as a material handler and warehouse associate prior to his termination on January 2013.

2. Defendant Parker Hannifin Corporation is an Ohio corporation duly licensed and registered to do business in North Carolina. At all times relevant to this Complaint, it operated its Parker SSD Drives Division in Mecklenburg County.

3. According to its website, Defendant is a diversified global manufacturer of motion and control technologies and systems used in a variety of industries which has operations in 49 countries.

4. Defendant employed more than 50 persons at its Parker SSD Drives and EGT Division facilities located in Charlotte at all times that Plaintiff worked there.

**JURISDICTION AND VENUE**

5. Plaintiff brings this action pursuant to 42 U.S.C. § 1981.

6. This Court has original jurisdiction over Plaintiffs' federal claim under 28 U.S.C. § 1331

7. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), as all events at issue occurred in Mecklenburg County.

8. A four-year statute of limitations from 28 U.S.C. § 1658 applies to Plaintiff's claims under 42 U.S.C. § 1981. See, *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004)

**FACTS**

9. Plaintiff was hired in 2000 by the predecessor company, Eurotherm, that later became Invensys and then SSD Drives.

10. Defendant acquired SSD Drives and called it the SSD Drives Division of Park Hannifin.

11. Plaintiff continued to work in the warehouse.

12. Plaintiff had an excellent record as an employee; he was prompt and dependable, an amiable co-worker, who thought of ways to improve the workplace.

13. In his last few years with the company, there were changes in management of the SSD Drives Division.

14. Chris Flynn was named the plant manager. He came from another Parker Hannifin site and brought in new management employees to work under him.

15. Flynn hired Brent Drennan to come from Michigan to be the manufacturing manager. Drennan had an abrasive, Napoleonic personality and actually admitted that he was not comfortable working around black people.

16. Under Flynn, Defendant hired Heather Radice as the Human Resource manager. Radice was involved in numerous disruptive and controversial terminations of employees, spawning other litigation against Defendant.

17. Defendant hired Charles Mathis as Plaintiff's supervisor in the warehouse.

18. Flynn also hired Brent Drennan to come from Michigan to be the manufacturing manager. Drennan had an abrasive, Napoleonic personality, who could not get along with others and actually admitted that he was not comfortable working around black people.

2

19. In August 2011, Brennan physically attacked Plaintiff.

20. Plaintiff was delivering parts from the warehouse to manufacturing locations in the plant. He was finishing a series of ordered deliveries when Drennan approached Plaintiff and ordered him to immediately pick a certain part and deliver it to someone.

21. Plaintiff explained that he was at the end of his current order run and would get the part as soon as he finished delivering the picked orders to the manufacturing cells.

22. To Plaintiff's complete surprise, Drennan exploded in rage and took an empty parts bin and rammed it into Plaintiff's chest, doing so in front of a number of other employees.

23. Drennan then turned and walked away.

24. Plaintiff had worked there over a decade and had never been attacked by someone and was upset. He went to human resources and described what had just happened; he then spoke with Charles Mathis and Theresa Whitney, his direct supervisors. Nothing happened; the matter was never addressed.

25. Five months later, in January 2012, the "lead" in the warehouse left and the vacant position was posted.

26. Plaintiff was the most experience warehouse associate and applied for the position in early February.

27. Unknown to Plaintiff, the position had been filled before Plaintiff interviewed.

28. Charles Mathis, who is white, had gone to Chris Flynn, who is white, and persuaded him to hire a friend of Mathis from another Parker Hannifin facility, Brad Hamrick, who was also white.

29. Plaintiff did not know the position had been filled when he interviewed for it.

30. Mathis told Plaintiff during the interview that he would not get the position. He stated that the lead person had to have at least an Associate's Degree. Plaintiff only had his high school diploma.

31. Plaintiff would later learn that Hamrick only had a high school diploma; that there was no requirement for an associate's degree and that Mathis had lied to him. The human resources representative in the interview knew that Mathis was lying, but said nothing.

3

32. Mathis also said that Plaintiff had a verbal warning in his file and thus could not be considered for the position.

33. Plaintiff was not aware of any verbal warning.

34. On February 27, 2012, the company announced in a plant meeting that Brad Hamrick had been hired as the new lead in the warehouse.

35. Hamrick was paid $20 per hour, a $4 per hour increase over the rate of his predecessor.

36. An associate in human resources informed Plaintiff that the decision to hire Hamrick had been made in January and that the company only interviewed Plaintiff at her insistence.

37. The interview was a sham.

38. According to the records, the next day, February 28, 2012, Mathis, Radice and Theresa Whitney met with Plaintiff and gave him the verbal warning that Mathis declared to exist in the interview.

39. It was a complaint by Drennan, that involved the August 2011 incident, but Drennan dated the complaint on February 22 and 23, 2012 – just days before the hiring of Hamrick.

40. Drennan claimed that Plaintiff had refused repeatedly to fill and order after being asked to do so, and claimed that this was a pattern of behavior.

41. Plaintiff was flabbergasted at the completely false allegations, which attempted to make it look like the August incident was a Plaintiff's fault and that he repeated this purported refusal to fill an order in February.

42. Plaintiff told Whitney, Radice and Mathis that the allegation was not true at all and refused to sign the document.

43. One of the three managers wrote on the document "Employee Did Not Sign."

44. Incredibly, one of the managers then forged and dated Plaintiff's signature on the very page where it was also written that he refused to sign the document.

4

45. Hamrick then proved to be a flop. He not only lacked the supposed required associate's degree, he had no prior warehouse experience.

46. Plaintiff was assigned to train Hamrick on how to do job that Plaintiff was not qualified to perform. It took Plaintiff three to four months to train Hamrick on how the warehouse operated and what his duties were as the lead.

47. This denial of promotion to a black employee was not limited to Plaintiff. No black employee was able to move up in the company after Flynn took over as plant manager and Radice as Human Resource manager. Those other employees who were blocked from advancement or terminated included Dennis Horton, who was denied the position given to Brent Drennan and then had to train Drennan; Jim Lowery was another black employee denied advancement, and Todd Malloy was ignored and spurned by the management team and then terminated.

48. Hamrick not only did not have an associate's degree and lacked warehouse experience, he proved himself an unreliable employee attendance-wise, forcing Mathis to cover for him. He was regularly late. Mathis had to change Hamrick's time cards to keep him from being terminated.

49. But Hamrick fit in with a social circle dominated by Radice, who had hired some of her friends to work at SSD Drives, and the group partied regularly outside of work. Hamrick became part of that social group.

50. In January 2013, Defendant announced it had to lay off some employees due to a downturn in business.

51. Under the layoff policy, Hamrick should have been let go. He had the least seniority in the warehouse and he had a poor attendance record, even with the corrections entered by Mathis.

52. Instead, on January 10, 2013, Mathis, Radice and Flynn called Plaintiff into the office and fired him, smirking and laughing as they did so. They told Plaintiff that he had been selected because his verbal warning was less the 12 months old, can made him the person to be let go, though he was the most experienced person in the warehouse.

53. When it had been purchased by Defendant, SSD Drives had a severance policy that applied to layoffs. The initial head of the newly acquired Division had promised all the SSD Drives employees that they would be entitled to severance if they were let go in a reorganization.

5

54. As he was fired, Plaintiff asked about the severance plan. Radice, Mathis and Flynn laughed at Plaintiff and told him that the severance policy did not apply to him.

55. As a result of the termination, Plaintiff was unemployed for many months, then took a temporary job that later became a permanent position, but pays about $3 less per hour than what Plaintiff earned working for Defendant. With the loss of overtime, Plaintiff now makes about $20,000 less per year than he did working for Defendant.

56. And he earns about $8 less per hour than what Hamrick was paid as the lead when he was hired.

57. Plaintiff suffered humiliation and despair in being fired after 13 years of dedicated service.

## FIRST CAUSE OF ACTION
### (42 U.S.C. § 1981 – Denial of Promotion)

58. All prior paragraphs are incorporated by reference.

59. Plaintiff was denied promotion to the lead position on account of his race. The position was instead given to a white employee with no warehouse experience.

60. Defendant had made the decision to hire the white employee into the lead position, despite his lack of relevant experience, a month before it went through a sham interview with Plaintiff.

61. In the interview, Defendant's manager falsely claimed that Plaintiff did not meet the minimum educational requirements for the position, when no such requirement existed and the white employee chosen for the position had the same education level as plaintiff.

62. Defendant then falsely claimed the Plaintiff had a verbal warning on his record and thus could not be considered for the position, but did not give him the warning until the day after announcing that the white employee had been selected.

63. And the content of the warning was deliberately false and created from whole cloth. In fact, the complaint was created by a white employee, who had physically assaulted Plaintiff in the workplace in August 2011 and had done so without any disciplinary consequence.

6

64. Plaintiff was the most qualified person for the lead position and it was denied him because of his race and in retaliation for complaining about being assaulted by a white supervisor.

65. Plaintiff seeks and is entitled to compensatory damages, including lost earnings and benefits.

66. Plaintiff seeks and is entitled to punitive damages, as actions of Defendant's managers evinced malice toward Plaintiff, showed willful and wanton disregard for his rights and involved fraud – the creation of false documents on which Plaintiff's signature was forged.

67. Plaintiff seeks and is entitled to attorney's fees.

## SECOND CAUSE OF ACTION
(**42 U.S.C. § 1981 – Discriminatory Termination**)

68. All prior paragraphs are incorporated by reference.

69. Defendant terminated Plaintiff on account of race, relying on the same deliberately false and forged document to justify the decision to terminate the most experienced and most senior warehouse employee, instead of terminating the least experienced and least senior employee who had a terrible attendance record.

70. Plaintiff seeks and is entitled to compensatory damages, including lost earnings and benefits.

71. Plaintiff seeks and is entitled to punitive damages, as actions of Defendant's managers evinced malice toward Plaintiff, showed willful and wanton disregard for his rights and involved fraud – the creation of false documents on which Plaintiff's signature was forged.

72. Plaintiff seeks and is entitled to attorney's fees.

## JURY DEMAND

73. Plaintiff demands that all matters be tried before a jury of her peers.

## PRAYER FOR RELIEF

Upon the trial of this matter, Plaintiff prays that the Court enter Judgment for her and award the following relief:

a. Injunctive relief, including reinstatement with payment of full back pay and benefits;

7

Case 3:16-cv-00098-FDW-DSC   Document 1   Filed 02/27/16   Page 7 of 8

b. Actual and compensatory damages;

c. Punitive damages under to the extent allowed under law;

d. The costs of this action, including reasonable attorney's fees under 42 U.S.C. §1988;

e. Any further the relief the Court deems just and necessary.

Respectfully submitted this 27th day of February, 2016.

>*/s/* **S. Luke Largess**
> S. Luke Largess (N.C. Bar #17486)
> TIN, FULTON, WALKER & OWEN, P.L.L.C.
> 301 East Park Avenue
> Charlotte, NC  28203
> (704) 338-1220
> llargess@tinfulton.com
> Attorney for the Plaintiff